UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.T. and M.T., individually and on behalf of E.T.,<br><br>Plaintiffs-Appellants,<br><br>-against-<br><br>New York City Department of Education,<br><br>Defendant-Appellee. | 15-CV-5226 (RJS)<br><br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs R.T. and M.T., individually and on behalf of E.T., by their attorneys, Regina Skyer & Associates, as and for their Complaint allege and state the following:

### PRELIMINARY STATEMENT

1.  Plaintiffs R.T. and M.T., on behalf of their child, E.T., bring this action pursuant to Section 1415(i)(2) of the Individuals with Disabilities Education Act ("IDEA"), as amended (20 U.S.C. § 1400 *et seq.*), the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law, and Part 200 of the Commissioner's Regulations against the New York City Department of Education (the "DOE"), seeking review and reversal of the State Review Officer's ("SRO") decision dated March 3, 2015

2.  On March 27, 2013, after conducting ten days of hearings and evaluating the testimony of 15 witnesses, Impartial Hearing Officer ("IHO") Weiner determined that the DOE had failed to provide E.T. with a free appropriate public education ("FAPE"), as mandated by the IDEA and applicable state law, and, after considering the parents' selected placement and the equities, ordered the DOE to reimburse E.T.'s parents for a portion of the tuition they had paid to

the Ezra Hatzvy School where E.T. was enrolled for the 2011-2012 academic year as well as a portion of the educational and related services that E.T. was provided with by his Parents. The IHO determined that the DOE's proposed class size and corresponding ratio of students to teachers would not allow E.T. to make educational progress when considering his individual special education needs that necessitated one-to-one instruction.

3. The DOE appealed the IHO's decision with regard to the appropriateness of the DOE's proposed placement, the appropriateness of the student's educational program, and the equities. The SRO, based solely on documentary evidence, reversed the IHO's decision and rejected the unanimous testimony of those with *any* exposure to E.T. that he requires one-to-one instruction to learn.

4. Through this action, R.T. and M.T. seeks a determination that:

    a. The DOE failed to provide E.T. with a FAPE for the 2011-2012 school year;

    b. The program provided by the Parents was an appropriate placement for E.T.;

    c. The equities favor E.T. and thus require, as found by the IHO, that the DOE should reimburse E.T.'s parents for the tuition and costs incurred; and

    d. That E.T. is entitled to any other further relief as may be just under the circumstances.

## JURISDICTION

5. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2)(A) and (3)(A). This Court has supplemental jurisdiction over any state law claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

6. Venue is proper under 28 U.S.C § 1391(b) because the parties reside in this judicial district.

7. If successful, R.T. and M.T. are entitled to costs and attorneys fees under 42 U.S.C. § 1988(b) and 20 U.S.C. § 1415(i)(3)(B) *et seq*.

## PARTIES

8. Initials are used throughout this Complaint to preserve the privacy and confidentiality of the child, E.T., and the family consistent with the privacy provisions promulgated under section 1417(c) of the IDEA, and the Family Education and Privacy Rights Act, 20 U.S.C. § 1232g.

9. Plaintiffs R.T. and M.T. are the parents of E.T. They reside, along with their two other children, in New York City.

10. Defendant DOE is a corporate body, created by Article 52 of the New York State Education Law, CLS Educ. Law § 2550 *et seq.*, that manages and controls the public school system of the City of New York. On information and belief, the DOE receives funding pursuant to the IDEA, and therefore must comply with that statute's provisions, including providing a FAPE to all students, including E.T., who reside within New York City. *See* 20 U.S.C. § 1412. The DOE's principal place of business is 52 Chambers Street, New York, New York 10007.

## FACTUAL ALLEGATIONS

11. E.T. is a child classified by the Department of Education with Multiple Disabilities. Ex. 2.

12. E.T. presents with a unique and complex medical history – he was born with one kidney and is currently followed by a Nephrologist. Ex. 7, Tr. 1117-1119. E.T. was diagnosed with encephalitis secondary to enteroviral sepsis at three weeks of age. *Id*. E.T. suffers from

cortical visual impairment, a hemivertebra at thoratic level 3, tonal and sensory anomalies, movement and postural asymmetries, generalized weaknesses and impaired balance. Ex. 2, 7, Tr. 1117-1119. E.T. struggles considerably in the areas of oral communication, fine motor precision and gross motor skills. Exs. 2, 7. E.T. is non-verbal and is totally dependent on others for all of his needs. Tr. 1117-19.

13.     As a result of his complex medical and neurological history, E.T. presents with significant global delays for which he requires intensive special education instruction and support services.

14.     E.T. began receiving special education services under the auspices of the New York State Early Intervention Program (hereinafter "E.I.") when he was less than one year old. Tr. 240.

15.     Upon aging out of E.I., E.T. transitioned into the Committee on Preschool Special Education (hereinafter "CPSE") and was placed in a full-time special education classroom at the Williamsburg Infant Childhood Development Center and additionally provided with the support of a 1:1 Special Education Itinerant Teacher (hereinafter "SEIT") and a host of school and home-based related services. Tr. 1122-23.

16.     At the age of five, E.T. transitioned into the CSE. Tr. 242. However, given the opinion of all professionals who knew and worked with E.T. that his needs could not be met in a DOE special class program, E.T. continued to receive his preschool services for an additional year, his kindergarten year, which was funded by the DOE. Tr. 242.

17.     At the conclusion of his kindergarten year, E.T.'s Parents expressed concern with the DOE's proposed program and unilaterally placed him at Ezra Hatzvy with the additional,

necessary support of home-based special education support and related services. Tr. 1123, 1126. E.T. remained enrolled in this program between from 2009 through June 2014. Tr. 1126.

18. For the 2010-2011 school year, E.T.'s Parents rejected the DOE's proposed program as inappropriate to meet E.T.'s needs and sought funding for E.T.'s educational program.

19. The DOE conceded that it did not offer an appropriate program for E.T. for the 2010-2011 school year, and an Impartial Hearing Officer found a majority of E.T.'s program to be appropriate, ordering the DOE to reimburse the Parents for E.T.'s base tuition at the private school as well as the provision of occupational therapy (hereinafter "OT"), physical therapy (hereinafter "PT"), speech and language therapy and a 1:1 paraprofessional in school and the provision of OT, speech and language therapy, and vision therapy in the home. The DOE appealed the determination of the Impartial Hearing Officer to the New York State Education Department's Office of State Review. In *Application of the XXX Board of Education*, Appeal No. 11-164.

20. The DOE argued that the Parents' unilateral placement was not appropriate because it did not provide E.T. with a 12-month school year and did not provide him with the necessary related services. Appeal No. 11-164 at 3.

21. The DOE did not contest that E.T. required a dual program consisting of both school and home-based services. *Id* at 5.

22. The State Review Officer upheld the appropriateness of the Parents' unilateral placement for the 2010-2011 school year finding that the related services of OT, PT and speech and language therapy in conjunction with a 1:1 paraprofessional provided at Ezra Hatzvy, as well

as the home-based services of OT, speech-language therapy, and vision therapy were reasonably calculated to enable the student to receive educational benefits. *Id.* at 13.

23. On May 26, 2011, the CSE convened to discuss the educational needs of, and develop an IEP for, E.T. for the 2011-2012 school year. At that meeting, the CSE review team classified E.T. as a child with Multiple Disabilities, and recommended a segregated special education class, with a 12:1:4 staffing ratio, in a specialized school with related services. Ex. 2.

24. The documents reviewed for the meeting included progress notes from the providers at Ezra Hatzvy, a DOE classroom observation, a CSE psycho-educational evaluation from August, 2009, a vision report from 2009 and a classroom observation from May of 2010. Exs. 5, 7-14.

25. Not one of the DOE employees had ever observed or worked with E.T. Ex. 2, Tr. 182-84.

26. E.T.'s then-current providers, Abie Levy, E.T.'s occupational therapist and clinical director at Ezra Hatzvy, Yocheved Waxman and Raizy Englander, E.T.'s classroom teachers, and Chaya Perl, E.T.'s speech therapist, were the only professionals participating at the IEP meeting with first-hand knowledge of his needs. Ex. 2-2.

27. These professionals made it clear that E.T. required a tremendous amount of support, structure and individualized attention in order to continue to progress. Tr. 228-29, 289, 233, 244, 249-51, 293, 325.

28. Moreover, E.T.'s Parents requested that he continue in the small, highly individualized private program with home-based related services. Tr. 1139, 1143, 1155.

29. Despite this, and without any indication that E.T. would be able to function in a larger class, the IEP recommends a 12:1:4 setting. Ex. 2, Tr. 319, 1162-62.

30.     Natalya Simarova, the DOE school psychologist who was present at the CSE review, provided no justification for the refusal to consider a more restrictive environment, and summarily rejected the opinion of the professionals that knew E.T. because she "didn't believe it was necessary or recommended." Tr. 319-320.

31.     The Parents later received a Final Notice of Recommendation (hereinafter "FNR"), which recommended that E.T. be placed in a Special Class at P109K. Ex. 3.

32.     At the underlying Impartial Hearing, the DOE's attorney elicited testimony, on direct examination of its own witness, that the school would have failed to appropriately implement E.T.'s IEP from the very first day of school. *See* Tr. at 56, lines 2-6, reproduced in its entirety below.

> Q:   Ms. Melnick: And would [E.T.] have had a health paraprofessional from the first day of school?
> A:   Ms. Ferguson: No, probably not during the first day of attendance.

33.     The DOE's attorney continued to establish that the program that E.T. was placed in did not comply with the IEP's mandate or State Regulation. While E.T.'s IEP mandates that he be placed in a 12:1:4 class, Ms. Taranova, the teacher of the classroom E.T. was placed in admitted, on *direct* examination, that she did not have four paraprofessionals in her classroom and had no knowledge that she was supposed to have four paraprofessionals. Tr. at 89, l. 10-18. This failure establishes that the recommended placement could not have appropriately implemented E.T.'s IEP. *See* 8 NYCRR §200.6(h)(4)(iii)

34.     In other words, in this case the DOE came forward and elicited testimony from its witnesses that (1) the school would not comply with E.T.'s IEP as it would not provide him with the paraprofessional mandated on his IEP in a timely fashion; (2) the school would not comply with the portions of E.T.'s IEP that mandates the use of specific methodologies; (3) the school would not comply with the staffing ratio appearing on E.T.'s IEP. Such failures conclusively

establish that the placement would not appropriately implement E.T.'s IEP and render the placement inappropriate as a matter of law. *See R.E.*, 694 F.3d at 192 (reaffirming that a school site selected by the school district must "conform[] to the program offered in the IEP.");*see also T.Y. v. New York City Dept. of Educ.*, 584 F.3d 412, 420 (stating that school districts do not "have *carte blanche* to assign a child to a school that cannot satisfy the IEP's requirements").

35. The law requires that Petitioner provide E.T. with all of the services recommended on his IEP as of the first day of the school year. 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.4[e][1][i]; *see Matrejek*, 471 F. Supp. 2d at 419 (stating "procedural inadequacies that cause substantive harm to the child or his parents – meaning that they individually or cumulatively result in the loss of educational opportunity . . . – constitute a denial of a FAPE"); *Grim*, 346 F.3d at 381 (stating "it is no doubt true that administrative delays, in certain circumstances, can violate the IDEA by depriving a student of his right to a 'free appropriate public education'").

36. A district must have an IEP in effect at the beginning of each school year for each student in its jurisdiction with a disability (34 C.F.R. § 300.323[a]; 8 NYCRR 200.4(e)(1)(ii); *Cerra*, 427 F.3d at 194; *Tarlowe v. New York City Dep't of Educ.*, 2008 WL 2736027, at *6 (S.D.N.Y. July 3, 2008 (stating "an education department's delay does not violate the IDEA so long as the department 'still ha[s] time to find an appropriate placement … for the beginning of the school year in September'").

37. While the District had timely formulated an IEP before the beginning of the school year, the District failed to offer E.T. a FAPE because it did not offer E.T. a 12:1+4 placement where the IEP could be implemented at the beginning of the school year.

38. The record demonstrates that the program at EHLC was individually designed to address E.T.'s needs. The program focuses on multiple domains, including general well being, physical development, cognitive development, communication and social/emotional development. Ex. B.

39.     During the 2011-2012 school year, EHLC provided E.T. with the individualized instruction that he required in order to learn.

40.     Over the course of the 2011-2012 school year, EHLC developed an individualized program for E.T. based on his visual, cognitive and physical disabilities. Ex. D, Tr. 678, 482-484.

41.     Due to his specific challenges[1], E.T. was placed in a class co-taught by Ms. Waxman and an assistant teacher, consisting of five children and five teaching assistants, rendering the staffing ratio 1:1. Tr. 672, 678-9, 742, 747. Ms. Waxman testified regarding the similarity of the developmental levels of the students in E.T.'s class, and discussed the overall appropriateness of E.T.'s peer grouping for the 2011-2012 school year. Tr. 382, 679.

42.     Ms. Waxman's class employed the Applied Behavior Analysis (hereinafter "ABA") methodology, which was individualized based on E.T.'s unique needs. Tr. 684.

43.     Based on the Assessment of Basic Language Learning Skills ("ABLLS"), in conjunction with teacher observations, class activities and teacher-made materials, the staff at the school was able to develop an individualized, fluid program to address E.T.'s myriad deficits. Tr. 675.

44.     The educational professionals at EHLC utilized baseline data to collaboratively develop individualized goals for E.T. for the 2011-2012 school year. Tr. 675. These specific and measurable goals facilitated E.T.'s need for the basic acquisition of skills needed as a foundation for his learning. Tr. 675-6.

45.     The record establishes that E.T.'s special educators focused on his specific behaviors and their consequences, and modified the overall program accordingly. The special education teachers strategically broke down all tasks and used constant repetition and drilling, which was vital for E.T.'s success. Ex. E-1, Tr. 680. E.T.'s special education teachers developed

---

[1] The grouping of children at Ezra HaTzvy is determined by the child's developmental ability and similarity of challenges or difficulties (Tr. 381).

a token reward system, comprised of specific, discreet tasks to provide E.T. a clear understanding of what was expected. Tr. 694-69, 710-13.

46. E.T. benefitted from the additional support of 1:1 Behavior Academic Instruction over the course of the 2011-2012 school year. Tr. 712-13. As a result of his significant behavior and overall global needs, E.T. required the constant, intensive, skill-driven 1:1 support found within the program's ABA methodology. Tr. 680. Ms. Waxman testified, and the record evidence unequivocally reflects, that E.T. significantly benefitted from the repetition and review inherent in the ABA methodology. Ex. E-1, Tr. 680. The record clearly demonstrates that E.T responded well to the token economy and made documented progress as a direct result of the principles utilized by the ABA methodology. Tr. 694-96.

47. E.T.'s overall academic program focused on pre-reading, pre-math and pre-writing skills, and was individually tailored based on his needs. *See* Ex. E-1. Ms. Waxman testified that over the course of the 2011-2012 school year, E.T. improved his ability to attend to books, was more responsive to questions and better able to identify pictures. *See* Tr. 729.

48. Moreover, the individualized program significantly facilitated E.T.'s focusing and allowed him to be a more active member of his educational community *Id*. During circle time, E.T. significantly progressed in his ability to sit for longer periods of time and "definitely became better with directions and attending." Tr. 731.

49. Due to the severity of E.T.'s developmental delays, he required a home program to supplement the work being done at school and to facilitate generalization and the record demonstrates that E.T.'s home program is appropriate and reimbursable. E.T.'s home program for the 2011-2012 school year was developed by his Parents and was a continuation of the services that he has always received. Tr. 952, 1128.

50. E.T. received vision therapy at home with Yuta Silverman, a New York State licensed vision therapist who has been working with E.T. since he was one year old. Tr. 600, 603-04.

51. Ms. Silverman's goals for E.T. for the 2011-2012 school year focused on walking independently, increasing his vision below shoulder level, increasing his eye contact, increasing visual tracking and increasing his ability to make visual choices. Tr. 613-14. Ms. Silverman testified that E.T. made good progress towards accomplishing these goals.

52. E.T. had speech sessions with Ms. Susan Morris twice a week for one hour. Tr. 1183. Ms. Morris used the Prompts for Restructuring Oral Muscular Phonetic Targets (hereinafter "PROMPT") method with E.T. and focused on his expressive and receptive language and his feeding issues. *Id*.

53. The IHO improperly held that the Parents did not establish the appropriateness of E.T.'s extended school year, and the IHO failed to provide *any* citation to the record, the Act, or any regulation in support of such a finding. *See* IHO Decision at 49.

54. The IHO properly determined that placement of E.T. at the EHLC was appropriate for E.T. *See* IHO Decision at 50 ("I find that the school did provide an educational benefit and on that basis the school is considered appropriate in this decision, even though there was no visual therapy. All of the reports and the testimony from the Ezra Hatzvy providers and the teacher claim the student made progress.")

55. The IHO improperly reduced reimbursement from $60,000 to $36,360 without proper basis or reasoning.

56. The IHO improperly reduced tuition by 10%, as the school "was four and a half days a week", rather than five days per week. IHO Decision at 51. The IHO failed to consider that the school day ran from 9am until 3:40pm, and thus was, in fact, longer than that mandated by the Commissioner of Education. *See* 8 NYCRR §175.5(a)(2).

57. The IHO also failed to consider that the Regulations of the Commissioner permit a shortened Friday if the total number of hours of instruction provided on a weekly basis equals at least 25 hours, which E.T.'s schedule at Ezra Hatzvy did provide. *See* 8 NYCRR §175.5(e); *see* Ex. D. As the IHO properly determined, whatever religious instruction did occur throughout the day was *de minimus* in nature, and no reduction was appropriate for such *de minimus* ritual

prayer. *See* IHO Decision at 50. As such, the IHO's reduction of 10% of the tuition cost due to half-day Friday's was improper as a matter of law and must be reversed.

58. The IHO improperly and unjustifiably reduced the reimbursement by $17,640, the cost of vision therapy obtained outside of school. *See* IHO Decision at 51.

59. The IHO's reasoning on this issue is premised on a demonstrably incorrect assumption – that if vision therapy was provided for E.T. in school, there would be no additional cost incurred by the Parents for such service. The IHO failed to recognize that the weight of the evidence demands a contrary conclusion and clearly demonstrates that his decision is not well reasoned. *See* Ex. M (providing that the base cost of tuition does not include the cost of related services, which are billed over and above the tuition cost). As such, even if E.T. had received vision therapy at the EHLC (or indeed, at any school), there would be an additional charge incurred for the provision of this service. *See id*.

60. As such, the IHO's reduction of the tuition cost improperly penalizes the Parents, who would have been responsible for the payment of such additional sums regardless of the location of the provision of the service.

61. The IHO improperly denied reimbursement for aquatic therapy provided to E.T. based on the demonstrably faulty reasoning that the record did not demonstrate that the service was provided by "a certified aquatic therapist and such sessions were necessary for educational success." IHO Decision at 52.

62. The record makes clear that this is incorrect – E.T. received aquatic therapy from an occupational therapist to address his difficulties with sensory processing, self regulation, fine motor skills, gross motor skills, oral motor control and posture. *See, e.g.,* Tr. 586. The aquatic therapy was particularly useful in addressing E.T.'s body awareness because the water provided constant feedback as to where his body was in space. *See* Tr. 493-94, 575.

63. Having demonstrated E.T.'s need for the service, and that the service was actually provided to E.T., the IHO's determination on this issue was improper and must be overturned.

64.     The IHO improperly denied reimbursement for speech and language therapy, physical therapy, and occupational therapy provided in school, on the faulty reasoning that "this is a type of double-dipping; charging for tuition and then separately charging a parent for a related service that is provided by a salaried employee." IHO Decision at 52-54.

65.     The contract between the Parents and the school makes clear that the cost of related services is not included in the tuition cost, as the program is individualized based on the needs of the students. *See* Exs. B, M.

66.     The IHO's reasoning would require that EHLC engage in one of two dishonest practices, either: (1) charging the tuition attributable to the most expensive program for the most impaired student attending the school, regardless of the individual program provided to the student; or (2) provide each student at the school with the same instructional and related services required by the most impaired student in the school, regardless of individual need. This rule defies logic, contravenes public policy, and would result in the unjust enrichment of private schools if they were to be paid by all parents that enroll their child in the school for services the school did not render. Instead, EHLC properly projects the total cost of the provision of the services in E.T.'s program, and builds this in the Parents' contractual obligation. *See id*.

67.     Attendance records for each of the related services appear in the record as Exhibit L. Such a practice demonstrates the appropriateness of the program developed by EHLC for E.T. and supports the Parents' request for reimbursement. *See Gagliardo*, 489 F.3d at 115 (a "private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child.") (internal citations omitted)

68.     The IHO improperly denied reimbursement for E.T.'s paraprofessional, not because E.T. did not need the service, and not because he did not receive the service, but because the Parent did not recall the paraprofessional's name and was not aware of the details of the employment arrangement between the paraprofessional and the school. *See* IHO Decision at 54.

69.     The record makes clear E.T. had a paraprofessional assigned to work with him throughout the school day – E.T. is "not at all independent" and his paraprofessional helped with

all of his needs, *i.e.* feeding, toileting, socializing. Tr. 777-78, 1119-20. She was also responsible for doing some of his discrete trials and carrying over the work of his therapists. Tr. 1134.

70. The IHO improperly denied reimbursement for Behavior Academic Instruction, not because E.T. did not need the service, and not because E.T. did not receive the service, but because the IHO postulated that the school was "double dipping" for the services of employees that were providing E.T. with the service. *See* IHO Decision at 55.

71. The record demonstrates that Behavior Academic Instruction is not included in the tuition charged to the Parents. *See* Ex. M. The record also makes clear that E.T. benefitted from the support and instruction of the 1:1 Behavior Academic Instruction over the course of the 2011-2012 school year. *See* Tr. 712-13; *see also* Ex. C (describing Behavioral Academic Instruction services); *see also* Ex. C (demonstrating that E.T. received Behavioral Academic Instruction throughout the day).

72. The IHO improperly denied reimbursement for Music Therapy based on his belief that the record does not demonstrate that E.T. received an educational benefit from the therapy. *See* IHO Decision at 58. Such denial was improper.

73. As the record makes clear, E.T. received music therapy at home once a week for forty-five minutes with Katie Down, a New York State licensed Music Therapist. Tr. 1045. Ms. Down's goals for E.T. included the use of bilateral stimulation to enhance his fine motor skills, balance, reaction time and relatability. Tr. 1050. She worked with E.T. on his verbal skills through songs, she worked on his balance and coordination through stomping games and dance, and she worked on his bilateral coordination by playing piano and drum rhythms using both the left and the right hand. Tr. 1046.

74. The IHO improperly denied reimbursement for Physical Therapy in the home, not because E.T. did not require the service, and not because E.T. did not receive the service, but because the IHO believed there to be a lack of communication between the provider and the in-school provider of Physical Therapy and because the provider did not issue a progress report. *See* IHO Decision at 59.

75. The IHO applied an improper standard in determining the appropriateness of the service.

76. E.T. received physical therapy at home once a week for forty five minutes with Ari Brand, a New York State board certified Physical Therapist. Tr. 1078. In his sessions, Mr. Brand worked on E.T.'s coordination, posture, strength and balance. Tr. 1080-81.

77. While the record makes clear that E.T. did progress through his receipt of the service, a private provider need not develop goals or an IEP for E.T. in order for the program to be appropriate and reimbursable under the act. *See Florence County Sch. Dist. Four et al. v. Carter by Carter,* 510 U.S. 7, 12.

78. The IHO improperly denied funding for Special Education Itinerant Teacher services in the home, insofar as he applied an improper standard in determining whether the service was reimbursable.

79. E.T. worked with Daniel Parelman, a Special Education Itinerant Teacher ("SEIT") at home five days a week for an hour per day to reinforce the work done at school and to continue to address E.T.'s significant needs. Tr. 952.

80. The IHO improperly denied reimbursement for Speech and Language therapy provided by Dr. Simeon Blitman.

81. E.T. received the therapy with Dr. Blitman twice a week for sixty minute sessions to address E.T.'s receptive and expressive language delays and oral motor control. Tr. 915.

82. A State Review Officer rendered a decision on March 3, 2015, in which she improperly determined that the DOE's recommended program was appropriate for E.T. *See* SRO Decision, generally.

83. *First*, the SRO improperly determined that the Department's IEP team had sufficient evaluative information to develop an IEP for E.T., when the record makes clear that the DOE's employees did not review this information prior to the meeting.

84. *Second*, the SRO improperly determined that the Parents were permitted to meaningfully participate in the IEP meeting, when the record makes clear that the Parents'

concerns were not considered by the DOE's employees, as the Department of Education illegally restricts the type of programs that its employees may recommend for students with disabilities.

85. *Third*, the SRO improperly determined that the 12:1:4 program recommended for E.T. was appropriate when all of the evaluations available to the IEP team, and all of the individuals that had ever taught, evaluated, and even met E.T., were unanimous in their opinions that E.T. could not learn in a 12:1:4 class, and instead required 1:1 instruction in order to learn.

86. *Fourth*, the SRO improperly determined that the DOE was not required to provide E.T. with instruction using ABA, *even though the IEP team included ABA in E.T.'s IEP*, because, in the SRO's opinion, some other unknown and unnamed methodology might be able to be used to instruct E.T.

87. *Finally*, the SRO committed legal error when she found that the Parents could not prevail on their claims that the DOE was unable to appropriately implement E.T.'s IEP even when it was the DOE that opened the door and provided testimony that it would not have complied with E.T.'s IEP if he attended the recommended public school.

### First Claim for Relief
### (Denial of FAPE in Violation of the IDEA)

61. Plaintiff repeats and realleges the allegations stated in paragraph 1 through 87 as if fully set forth herein.

62. In violation of the IDEA, 20 U.S.C. § 1400 *et seq.*, Defendants denied E.T. a FAPE for the 2011-2012 academic year. Such denial results from the substantive inadequacies in the IEP and the proposed public school placement, as described above or as otherwise may be established.

### Second Claim for Relief
### (Denial of Rights Under New York State Law)

63. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 87 as if fully set forth herein.

64. Defendants have violated Article 89 (N.Y. Educ. Law § 4400 *et seq.*) and regulations promulgated thereunder by failing to provide E.T. with a FAPE as set forth above or otherwise is established.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request this Court:

a. to reverse the SRO's decision of March 3, 2015;

b. to hold that the DOE failed to provide E.T. with a FAPE for the 2011-2012 school year;

c. if deemed necessary, to affirm the Impartial Hearing Officer's decision that the Ezra Hatzvy placement was appropriate for E.T. for the 2011-2012 school year;

d. to order the DOE to pay for or reimburse Plaintiffs for all tuition, educational and related service costs, transportation costs and fees, and related fees and costs in connection with E.T.'s program during the 2011-2012 school year;

e. to declare that Plaintiffs are the substantially prevailing party;

f. to grant leave, pursuant to governing law, to Plaintiffs' counsel to submit a fee application for the purpose of recovering statutory attorneys fees and other recoverable costs incurred at the administrative level, the SRO level, and in this action; and,

-18-

g.    to grant Plaintiffs any additional relief as the Court deems appropriate.

Dated: New York, New York
       July 31, 2015

                      Respectfully Submitted,

                      **SKYER & ASSOCIATES**

                      By: /s/_____
                      JESSE COLE CUTLER
                      SKYER & ASSOCIATES, L.L.P.
                      276 Fifth Avenue, Suite 402
                      New York, NY 10001
                      (212) 532-9736
                      jcutler@skyerlaw.com

                      *Attorneys for E.T.*