# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 15-cv-5226
(RJS)

M.T. & R.T., INDIVIDUALLY AND ON BEHALF OF E.T.,

Plaintiffs,

VERSUS

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

OPINION AND ORDER
February 19, 2016

RICHARD J. SULLIVAN, District Judge:

Plaintiffs M.T. and R.T., individually and on behalf of their minor son, E.T., bring this action against the New York City Department of Education ("Defendant" or "DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"). Specifically, Plaintiffs assert that DOE failed to provide a fair and appropriate public education for E.T., and they seek reimbursement for the cost of their son's enrollment at Ezra HaTzvy Academy ("Ezra HaTzvy"), where they unilaterally enrolled E.T. for the 2011–2012 school year. Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, Plaintiffs' motion is DENIED, and Defendant's motion is GRANTED.

I. BACKGROUND

A. Statutory Framework

The IDEA requires states benefiting from federal funds to provide a "free appropriate public education" to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Under the statute, a free appropriate public education ("FAPE") must offer "'special education and related services' tailored to meet the unique needs of a particular child" and "'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

The special education and related services required by the IDEA are provided to students based on an individualized education program ("IEP"), which school districts must provide annually. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988). A "team" consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child, meets for the purpose of crafting the IEP. 20 U.S.C. § 1414(d)(1)(B). In New York, this IEP team is called the Committee on Special Education ("CSE"), and a DOE representative serves as the CSE team leader. *See* N.Y. Educ. Law § 4402(1)(b)(1). To the extent the members of the CSE team disagree, the DOE representative's determination prevails at this stage. *See M.H. v. N.Y.C Dep't of Educ.*, 712 F. Supp. 2d 125, 132–35 (S.D.N.Y. 2010). DOE's practice "is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation . . . identifying a specific school at a later date. The parents are then able to visit the placement before deciding whether to accept it." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 191 (2d Cir. 2012).

The IDEA also establishes "procedural safeguards" to ensure that students with disabilities receive a FAPE. 20 U.S.C. § 1415(a). Specifically, the law requires states to provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). To adjudicate parents' complaints, New York has implemented a two-tiered system of administrative review. N.Y. Educ. Law § 4404. Under the first tier, parents dissatisfied with a proposed IEP may seek review by an impartial hearing officer ("IHO"). *Id.* § 4404(1). Following the decision of the IHO, an aggrieved party may appeal to a state review officer ("SRO"). *Id.* § 4404(2). After exhausting this two-tiered administrative process, any party still aggrieved may bring a civil action challenging the SRO's decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Additionally, pursuant to the IDEA's procedural safeguards, parents dissatisfied with an educational placement provided by a school district may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with DOE seeking reimbursement for the private school tuition. *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015). A school district must reimburse parents for unilaterally selected educational services if the parents can establish that: (1) the educational program recommended in the IEP was inappropriate to meet the child's needs; (2) the alternative placement or additional services selected by the parents were appropriate; and (3) equitable factors weigh in favor of reimbursement. *See C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). Parents seeking reimbursement for a unilateral private placement bear the burden of proving that it was appropriate. *Schaffer*

*v. Weast*, 546 U.S. 49, 57–58 (2005); N.Y. Educ. Law § 4404(1)(c). Thus, parents who believe that the state has failed to offer their child a FAPE act "at their financial risk" when choosing to unilaterally enroll their child in a private school. *Reyes v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014).

### B. Facts[1]

E.T. is a student designated by DOE as a child with "multiple disabilities." (JA 310.) Specifically, E.T. has been diagnosed with a spinal malformation, an impairment in the manner his brain processes images, an inability to aim both eyes in the same direction, and severe delays in gross and fine motor skills. (JA 186–89.) As a result of his disabilities, E.T. is largely non-verbal, legally blind, walks with a rigid gait, and suffers from poor balance. (JA 318–19, 343, 903.) As a young child, E.T. received Early Intervention services through the Department of Education. (JA 1020.) Once he aged out of that program, E.T. transitioned to the public school system. (JA 1543–44.) Thereafter, at the age of six, E.T. began attending Ezra HaTzvy, a private specialized school for children with special needs. (JA 1543.) At the beginning of the 2011–2012 school year, E.T. was seven years old, and he performed academically on a pre-kindergarten to kindergarten level in both math and reading. (JA 182.)

### 1. CSE Meeting

On May 26, 2011, the CSE conducted an annual review to discuss E.T.'s progress and recommend an IEP for his upcoming 2011–2012 school year. (JA 310.) Melody Fuchs, a special education teacher, served as District Representative for DOE and as CSE team leader; she appeared along with DOE psychologist Natalya Simarova. (JA 311.) M.T. also took part in the meeting, along with several individuals from Ezra HaTzvy who participated via phone, including: occupational therapist Abraham Levi, unlicensed special education teacher Yocheved Waxman, special education teacher Raizy Englander, speech and language therapist Chaya Perl, and DOE vision therapist Giovanca Brignoni. (*Id.*)

In advance of the CSE meeting, the team reviewed the materials in E.T.'s file. These items included a classroom observation, dated January 20, 2011 (JA 342–43); a psychoeducational evaluation, dated August 17, 2009 (JA 345–47); a speech/language progress report, dated March 20, 2011 (JA 348–49); an occupational therapy progress report, dated March 14, 2011 (JA 350–52); a physical therapy progress report, dated March 22, 2011 (JA 353–54); an Ezra HaTzvy progress report, dated March 22, 2011 (JA 355–57); a pediatric ophthalmic re-evaluation, dated September 23, 2009 (JA 358–59); and an observation report encompassing both academic and related service sessions, dated May 11, 2010 (JA 360–61). During the CSE meeting, the team discussed E.T.'s upcoming school year, guided by the Ezra HaTzvy progress reports and the input of the CSE team members. (JA 593–94, 610, 614, 677–78, 1575.)

---

[1] The following facts are drawn principally from the parties' joint appendix, which was filed under seal. (Doc. No. 17 ("JA").) In deciding the parties' instant cross-motions for summary judgment, the Court has also considered Plaintiffs' amended memorandum of law in support of their motion for summary judgment (Doc. No. 21 ("Pl. Mem.")), Defendant's amended memorandum of law in support of its cross-motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment (Doc. No. 20 ("Def. Mem.")), Plaintiffs' amended reply (Doc.No. 22 ("Pl. Reply")), and Defendant's reply (Doc. No. 23 ("Def. Reply")).

During the meeting, M.T. and the Ezra HaTzvy representatives shared input on a range of subjects, including E.T.'s academic, physical, and emotional status and needs with the IEP team. This information was then integrated into the IEP plan. (JA 312–14, 316, 318, 593–94.) M.T. further asked that E.T. receive a one-on-one health paraprofessional, adapted physical education, and an adaptive device called "Tech Talk" to assist E.T. in communicating; the IEP integrated these requested services. (JA 317, 336, 608–09.) The parents further asked that the IEP team recommend placement at Ezra HaTzvy for E.T. on the front page of the IEP, which the DOE representative stated she was unable to do because the private school was not among those schools approved for private IDEA placements by New York State. (JA 337, 682–83.) The parents then stated their intention to file a due process complaint. (JA 341, 679.)

At the end of the session, the DOE team recommended a 12-month placement in a 12:1:4 class – meaning twelve students, one special education teacher, and four paraprofessionals trained to address physical and emotional issues – located in a specialized school. (JA 310, 680–81.) DOE further recommended that E.T. receive a full-time paraprofessional along with the following related services: education vision services four times each week for 60-minute sessions, occupational therapy five times each week for 60-minute sessions, speech/language therapy five times each week for 60-minute sessions, and physical therapy five times each week for 45-minute sessions. (JA 336–38.) The IEP further chronicled E.T.'s performance levels both academically and physically, offering strategies and goals to address his needs. (JA 312–35.) Specifically, the IEP included eleven strategies and thirty-one annual goals, ranging in subject from academic goals like counting correctly from one through ten in 80% of trials to physical goals like feeding himself independently 80% of the time. (JA 312–35.)

On June 13, 2011, DOE issued a Final Notice of Recommendation ("FNR"), offering E.T. a placement in a 12:1:4 class at P4, a special education school located within a general education school building. (JA 340.) On July 5, 2011 the parents visited P4, and on August 30, 2012, M.T. wrote to DOE to reject the recommended placement on the grounds that it did not provide the individual attention she believed E.T. needed, that the class was too large, and that the peer group was inappropriate. (JA 300–01, 1585–89.)

During the 2011–2012 school year, E.T. re-enrolled at Ezra HaTzvy. (JA 199–204.) There, he and four other classmates – each with his own paraprofessional – received instruction from a teacher and assistant teacher. (JA 342, 1099–100, 1163.) A paraprofessional also accompanied E.T. at all times to assist with communication, balance, eating, and using the restroom. (JA 338, 1540–41, 1555.) E.T. also received related services including physical therapy, occupational therapy, and speech therapy during school hours. (JA 184–91.) After school hours concluded, E.T. received additional one-on-one sessions in speech, vision, music, occupational, and physical therapy, with sessions continuing back-to-back until 8:00 or 9:00 p.m. (JA 689–92, 1593.)

On May 25, 2012, Plaintiffs filed a Due Process Complaint with DOE seeking reimbursement for E.T.'s Ezra HaTzvy tuition for the 2011–2012 school year as

4

well as the costs of related services and E.T.'s one-on-one paraprofessional. (JA 303–08.) The Complaint requested a hearing to determine whether or not DOE had offered E.T. a FAPE and whether the parents should be reimbursed for the cost of their unilateral placement and accompanying related services. (JA 303.) Specifically, the parents sought funding for Ezra HaTzvy tuition, a Special Education Itinerant Teacher, physical therapy, occupational therapy, speech/language therapy, vision therapy, music therapy, and a full-time paraprofessional. (JA 303–04.)

### 2. IHO Hearing

The parties commenced an IHO hearing on July 13, 2012 (JA 30), during which the IHO received testimony from fourteen witnesses, including members of the CSE team, over ten non-consecutive days (JA 30–33).

The IHO issued its written opinion on March 27, 2013. (JA 29–91.) After presenting a detailed chronicle of the testimony presented at the hearing, the IHO found that DOE had failed to offer E.T. a FAPE in light of testimony that the P4 public placement would not have provided the one-on-one teacher and paraprofessional attention that E.T. required. (JA 74–80.) The IHO concluded that the fact that the teacher at the recommended placement did not employ the Applied Behavioral Strategies ("ABA") methodology – a system of instruction involving repetition and reinforcement through discrete trials (JA 1116–17) – amounted to merely "throwing [the] student into a program that is convenient for the DOE" (JA 75). In addition, the IHO found that E.T. required one-on-one instruction by a teacher and concluded that the IEP failed to meet that need. (JA 76.) Further, the IHO concluded that the recommended placement might not be able to provide the IEP's mandated one-on-one paraprofessional support for E.T. – on his first day of school or thereafter – because the placement utilized "floating" paraprofessionals and no student enrolled at the public placement had a full time one-on-one paraprofessional. (JA 76–77.) Finally, the IHO found that, while it was a "close decision," Ezra HaTzvy was an appropriate placement for the child, and he ordered reimbursement for $36,360 – a portion of the $184,250 in tuition and related services that the parents had requested. (JA 79, 88, 1572–73.)

### 3. SRO Opinion

On May 1, 2013, DOE appealed the IHO's decision on all counts to an SRO (JA 92–135), and on June 10, 2013, Plaintiffs answered DOE's appeal and cross-appealed the IHO's decision regarding reimbursement (JA 136–56). On March 3, 2015, the SRO issued its opinion, which concluded that DOE had offered E.T. a FAPE for his 2011–2012 school year and denied reimbursement to Plaintiffs. (JA 5–28.) Specifically, the SRO determined that the CSE had reviewed sufficient materials to develop an appropriate IEP for E.T. (JA 16–18.) It further found that E.T.'s parents had a meaningful opportunity to participate in the CSE process, since M.T. and representatives from Ezra HaTzvy were able to both make observations and voice their concerns during the meeting, and their input was included in the IEP. (JA 18.)

Additionally, the SRO found that the IEP's 12:1:4 class recommendation, considered in conjunction with the related services and goals also included in the IEP, was reasonably calculated to obtain an

educational benefit for E.T. (JA 19–21.) The SRO further held that the recommended one-on-one full time paraprofessional, physical therapy sessions, occupational therapy sessions, speech/language therapy sessions, and vision therapy sessions were appropriate for E.T. (JA 21–23.) Moreover, the SRO noted that the reference to ABA methodology in the IEP was not a mandate for E.T.'s 2011–2012 school year, but rather a description of E.T.'s prior classroom activities and his progress in that environment. (JA 24.) Additionally, the SRO determined that the annual goals included in the IEP were specific, tailored to the student's needs, and appropriate for E.T. (JA 24–25.)

Finally, since Plaintiffs had not enrolled E.T. at the DOE-recommended P4 location, the SRO reviewed the IEP on its face. (JA 26–27.) The SRO found that Plaintiffs' claims regarding the classroom composition, one-on-one paraprofessional, and instruction options were speculative and did not amount to a violation. (JA 27.) Accordingly, the SRO concluded that DOE had provided E.T. with a FAPE and denied reimbursement without proceeding through the later steps of the IHO's analysis. (JA 28.)

### C. Procedural History

On July 6, 2015, Plaintiffs filed a complaint seeking review of the SRO's decision. (Doc. No. 1.) They subsequently moved for summary judgment on October 23, 2015. (Doc. No. 12.) On November 25, 2015, Defendant cross-moved for summary judgment, arguing that the SRO correctly denied Plaintiffs reimbursement. (Doc. No. 14.) The motions were fully submitted as of January 26, 2016. (Doc. No. 23.)

### II. STANDARD OF REVIEW

IDEA actions in federal court are frequently resolved on summary judgment motions. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Unlike a typical motion for summary judgment, however, in an IDEA action, the existence of a disputed issue of fact will not defeat the motion. *A.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009). Rather, the district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citation omitted).

This independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Instead, a district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C.*, 553 F.3d at 171 (internal quotation marks and brackets omitted). The Court's review, therefore, "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *M.H.*, 685 F.3d at 244 (internal quotation marks and alterations omitted).

In cases where the SRO's decision conflicts with the earlier decision of the IHO, "the IHO's decision 'may be afforded diminished weight.'" *A.C.*, 553 F.3d at 171 (quoting *Gagliardo*, 489 F.3d at 113 n.2).

Further, a district court must "'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'" *Id.* (quoting *Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)). Deference is "particularly appropriate" where the state officer's "review has been thorough and careful." *Walczak*, 142 F.3d at 129.

### III. DISCUSSION

"Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07). The Court will first address procedural challenges before turning to substantive disputes.

#### A. Procedural Review

The Second Circuit has emphasized that "[t]he initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (citation and internal quotation marks omitted). However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Procedural errors render an IEP inadequate and deny a FAPE only where they have "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Here, Plaintiffs argue that the 2011–2012 IEP was procedurally deficient because the CSE team (1) failed to rely upon sufficient evaluative materials when crafting E.T.'s IEP and (2) did not provide M.T. and representatives from Ezra HaTzvy with a full and meaningful opportunity to participate during the CSE meeting. (Pl. Mem. at 12–15.) The Court will address each point below.

##### 1. Sufficiency of Evaluative Materials

Plaintiffs argue that the CSE team failed to gather, review, and rely upon sufficient evaluative material to justify its IEP recommendation. (*Id.* at 13.) As an initial matter, Plaintiffs failed to raise this issue in their Due Process Complaint and, therefore, cannot assert it now. *D.N. v. N.Y.C. Dep't of Educ.*, No. 11-cv-9223 (NRB), 2013 WL 245780, at *3 (S.D.N.Y. Jan. 22, 2013) ("[A] parent's ability to raise claims at *any* level of the proceedings is circumscribed by the allegations in the due process complaint.") (citing 20 U.S.C. § 1415(f)(3)(B); 34 C.F.R. § 300.511(d); 8 N.Y.C.R.R. § 200.5(j)(1)(ii)).

But even if the Court were to consider the claim, it would find that it had no merit. The testimony of Natalya Simarova ("Simarova"), the DOE psychologist, explains that the CSE team reviewed the student's entire file, which included reports from E.T.'s teachers and his service providers, a classroom observation conducted by the school psychologist, an observation completed by a vision specialist,

7

psychological testing reports, and letters from medical specialists. (JA 591–92; *see also* JA 342–43, 345–61.) Moreover, the record indicates that the CSE team used the materials listed above to formulate E.T.'s 2011–2012 IEP. (JA 610, 1575.) For example, Simarova testified that the Ezra HaTzvy reports were discussed and referred to during the CSE meeting in order to update the child's IEP and ensure that the document accurately reflected E.T.'s current status. (*See, e.g.*, JA 647 ("I remember that one of the teachers ran through a progress report from beginning to end. Goals were reviewed with the teacher on the phone.").) Having thoroughly consulted the record, the Court agrees with the SRO that the evaluative materials gathered, reviewed, and relied upon by the CSE team were sufficient to generate E.T.'s 2011–2012 IEP.

2. Parents' Opportunity to Participate

Plaintiffs further allege that they were denied a meaningful opportunity to contribute during the CSE meeting from which the CSE team generated E.T.'s IEP. (Pl. Mem. at 14–15.) The Court disagrees.

As noted above, the record reflects that M.T. attended the CSE team meeting, along with four representatives from Ezra HaTzvy. (JA 311.) During the meeting, they provided information regarding E.T.'s current status and assisted in crafting his IEP. (JA 610, 614, 677–78, 1575.) In fact, the input of M.T. and E.T.'s related service providers was instrumental in crafting the goals and related services recommendations included in E.T.'s IEP. (JA 609–17.) For example, the parents' request for a Tech Talk device, music therapy, and a one-on-one paraprofessional were directly integrated into the IEP's mandate. (JA 608–09 (paraprofessional), 609–10 (Tech Talk), 614 (music therapy).)

Of course, the CSE team did not recommend the Ezra HaTzvy program requested by the parents. But this refusal hardly amounts to a failure to consider "why [E.T.] needed a more restrictive setting" than the 12:1:4 recommendation. (Pl. Reply at 7.) Put simply, the evidence in the record demonstrates that E.T.'s parents were principally focused on securing a recommended placement at Ezra HaTzvy, where E.T. was already enrolled, and that they did not address alternative class sizes – with, for example, six or eight students – or encourage DOE to select a public placement with fewer classmates for E.T. (JA 682 ("The parents basically, their request was to recommend the program at Ezra HaTzv[y] School, and actually they asked the team to recommend the school on the IEP and put the name of the school on the IEP and the program [E.T.] was attending there."); JA 683 (noting that the parents had not "indicate[d] that they would be open to any other program" and that they "specifically wanted" Ezra HaTzvy).) Under the circumstances, it cannot be said that DOE was unwilling to discuss the issue of a proper classroom size for E.T. during the CSE meeting. *Cf. T.K. v. N.Y.C. Dep't of Educ.*, No. 14-cv-3078, 2016 WL 229842, at *4 (2d Cir. Jan. 20, 2016) (finding that DOE's "persistent refusal to discuss" a child's bullying "at important junctures in the development of her IEP" constituted a procedural violation). The IDEA's procedural requirements mandate only a parent's opportunity to participate, "not that the parent have the final word." *A.M. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 280 (S.D.N.Y. 2013). And M.T.'s own testimony before the IHO demonstrates that this standard was met here. (*See* JA 1575

(describing M.T.'s role at the CSE meeting as "listening to what the people that were at the meeting had to say about their recommendations . . . [t]hen asking them to continue on with services that [E.T.] is getting such as at-home services and giving my opinions when they respond about those services. Basically just general participation").) Thus, the parent's failure to persuade DOE of her view regarding the specific school location for E.T. did not constitute a deprivation of the right to participate in the CSE meeting or otherwise deny E.T. a FAPE.

Accordingly, the Court finds no procedural deficiencies, whether considered independently or collectively, in the process by which the CSE team generated E.T.'s IEP.

### B. Substantive Review

The IDEA requires school districts to provide each disabled student with an IEP "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. This standard, however, does not require the school district to "'maximize the potential of handicapped children.'" *Walczak*, 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 199). Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra v. Pawling Centr. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal citation and quotation marks omitted). The statute requires only an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (citation omitted).

Generally, "substantial deference is owed to the judgments of state administrative officers" on questions of an IEP's substantive adequacy. *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers.").

Concerns regarding a student's public placement also present substantive challenges to a child's FAPE. The Second Circuit has recently cautioned, however, that where a child never enrolls in the public placement, the Court may not consider "speculative" evidence regarding the placement. *R.E.*, 694 F.3d at 195. Accordingly, only information available to the parents and student at the time of their rejection of the IEP, and not new evidence first uncovered at a later date, may support a finding of a substantive denial of a FAPE. *See id.*

Here, Plaintiffs argue that the IEP's 12:1:4 recommendation and DOE's P4 placement were substantively inadequate to provide E.T. with a FAPE. (Pl. Mem. at 15–22.) The Court will address each of these substantive arguments in turn.

### 1. The 12:1:4 Program Recommendation

Plaintiffs maintain that "the record [in this matter] is devoid of any evidence to show that E.T.'s individual needs would be met in a special class with a 12:1:4 staffing

ratio" like that recommended in E.T.'s IEP. (*Id.* at 15.) A thorough review of the record before the Court, however, reveals that the CSE team relied on the documents it considered prior to the meeting along with comments made during the meeting to recommend the 12:1:4 special education classroom that, in its experience, was most appropriate for E.T.

New York State regulations state that a 12:1:4 classroom is appropriate for students "with severe multiple disabilities, whose programs consist primarily of habilitation and treatment." 8 N.Y.C.R.R. § 200.6(h)(4)(iii). And while environments affording more opportunities for one-on-one or smaller group instruction with the classroom teacher were available to the CSE team, the record demonstrates that DOE felt those programs would have been unduly restrictive for E.T. (JA 695–96.) During the IHO hearing, Simarova explained that E.T. had learned to walk and made great progress in the skills necessary to care for himself; however, the team was concerned that E.T. did not initiate interaction with his peers, and the team felt he needed to develop his social skills. (JA 316 (noting that E.T. was "unable to interact with others in an age appropriate level" but was "becoming more functional in a social setting").) The CSE team selected a larger classroom to address this concern. (*See* JA 600–01 (stating that the CSE team discussed E.T.'s social skills, noting that he "was trying to reach out to others," "was showing interest for others," and "was enjoying being in a group").) Nevertheless, in order to ensure that E.T. continued to receive a substantial portion of his instruction in a one-on-one setting, the CSE team recommended both (1) a full-time, one-on-one paraprofessional to assist with E.T.'s mobility and reinforce academic and therapy lessons and (2) over seventeen hours of one-on-one related services instruction each week. (JA 336–38.) The SOR found that this combination of peer interaction, one-on-one attention from his paraprofessional, and substantial one-on-one instruction with respect to related services would best serve E.T. for the upcoming school year. (JA 19–21.)

Plaintiffs cite a number of cases to suggest that only a one-on-one instructional program should have been selected for E.T. (Pl. Mem. at 16–19 (citing cases).) In each of these cases, however, the child at issue exhibited serious behavioral management issues that required focused individual attention and instruction. For example, in *C.L. v. New York City Department of Education*, 552 F. App'x 81, 82 (2d Cir. 2014) (summary order), the child required a "1:1 behavior management paraprofessional," and the Second Circuit in *C.F. v. New York City Department of Education*, 746 F.3d 68, 79 (2d Cir. 2014), specifically stated that "the dispute over the staffing ratio [for the child's classroom] directly relates to [the child's] maladaptive behaviors." E.T., in contrast, exhibited no maladaptive behaviors and was described as highly sociable, cooperative, and "a pleasure to work with." (JA 313, 316, 366.) Moreover, E.T. was open to social interaction – he was "becoming more aware of his environment, maintain[ed] eye contact for a short period of time and [was] becoming more functional in a social setting." (JA 316.)

Obviously, the parents, who know E.T. best, disagreed with the IEP's program recommendation and expressed their concern that E.T. required one-on-one educational instruction. But "it is not for the federal court to choose between the views of conflicting experts." *See R.E.*, 694 F.3d at

10

189. In fact, the Second Circuit has specifically cautioned that "[t]he adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if [the SRO's opinion] is supported by sufficient evidence." *Id.* at 192. Here, after a thorough review of the record, the Court cannot say that the 12:1:4 program selection, viewed in connection with the entire IEP, was unlikely to produce progress such that the IEP was substantively inadequate.

### 2. Placement at P4

Finally, Plaintiffs claim that DOE failed to establish that the recommended public placement at P4 could properly implement the mandate of E.T.'s IEP. (Pl. Mem. at 20–22.) Specifically, Plaintiffs contend that facts regarding P4 demonstrate that the school (1) "would not have provided [E.T.] with the 1:1 health paraprofessional mandated on his IEP in a timely fashion," (2) "would not have been able to comply with portions of the IEP that mandated the use of specific methodologies," and (3) "would not have complied with the staffing ratio appearing on E.T.'s IEP." (*Id.* at 20.)

The Second Circuit has clearly held that, if a child does not enroll in the public placement recommended by DOE, the adequacy of the public placement must be determined on the face of the IEP. *R.E.*, 694 F.3d at 187 ("In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan."); *see also M.O.*, 793 F.3d at 244 (2d Cir. 2015) (reaffirming *R.E.*). Thus, while the school district does not have "carte blanche" to assign a placement "that cannot satisfy the IEP's requirements," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009), "[s]peculation that a school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement," *R.E.*, 694 F.3d at 195.

Of course, *R.E.*'s instruction to evaluate an IEP on its face, without speculation regarding its implementation, "does not foreclose *all* prospective challenges to a child's proposed placement school." *M.O.*, 793 F.3d at 244. As the Second Circuit recently explained:

> While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP. For example, it is not speculative to conclude that an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free. Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

*Id.* (citations omitted). This test of a school's capacity to implement a student's IEP, however, is limited to facts uncovered by a parent *prior to* rejecting the placement option. It does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO

hearing. *See R.E.*, 694 F.3d at 187 ("In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties *at the time of the placement decision*." (emphasis added)); *see also M.O.*, 793 F.3d at 244 ("[A] school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation."). Accordingly, a plaintiff's claims may rest on documents created at the time of their decision to reject the public placement and any testimony later offered regarding facts they discovered themselves or learned from others during that period. They may not, however, rest on evidence regarding the proposed placement discovered after the parents had rejected the IEP.

Here, two of Plaintiffs' claims arise exclusively from evidence not available at the time of their placement decision. First, Plaintiffs claim that the P4 placement would not have provided E.T. with the full slate of his mandated services beginning on the first day of school based solely on "[t]estimony elicited by the DOE during the Impartial Hearing" regarding facts previously unknown to the parents. (Pl. Mem. at 21.) Second, Plaintiffs argue that the likely teacher of E.T.'s 12:1:4 class at P4 "did not have four paraprofessionals in her classroom and had no knowledge that she was supposed to have four paraprofessionals" – information likewise "elicited through witnesses" presented at the IHO hearing and not uncovered prior to the parents' rejection of the proposed placement. (Pl. Mem. at 21–22.) Accordingly, neither of these claims survives *R.E.*'s proscription against later developed evidence, and the SRO was not required to address their merits.

In fact, after omitting all of Plaintiffs' retrospective evidence, the only arguments against the proposed placement presented on this record are those laid out in M.T.'s letter to DOE rejecting the P4 placement. There, M.T. stated that she "was informed that the class has children ranging in ages, classification, and functional levels" to a degree inappropriate for E.T., and that she "was informed that the recommended school does not have the requisite level of related services that [E.T.] requires." (JA 300.) These vague allegations hardly suggest that P4 lacked the *capacity* to implement E.T.'s IEP, as they at most suggest that E.T.'s class *might* include what M.T. considered to be an "inappropriate" peer grouping or fail to deliver related services as prescribed. *See H.C. v. N.Y.C. Dep't of Educ.*, No. 14-cv-1927 (AKH), 2015 WL 1782742 at *4 (S.D.N.Y. April 9, 2015) ("[T]he law does not require that students be grouped with others of identical academic abilities."). Additionally, evidence of this type is speculative and cannot render a placement inadequate. *Compare J.D. v. N.Y.C. Dep't of Educ.*, No. 14-cv-9424 (ER), 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that [placement] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and was thus properly excluded from consideration by the SRO."), *and Y.F. v. N.Y.C. Dep't of Educ.*, No. 15-cv-6322 (LGS), 2015 WL 4622500, at *6 (S.D.N.Y. July 31, 2015) ("[T]he fact that the placement had not always delivered all required special education services to its students does not establish that the placement could not provide the required services to [the student]."), *with M.O.*, 793 F.3d at 245 n.7 (noting that the "sole viable

[prospective] challenge" advanced in the matter "was that the IEP had recommended [the student] repeat the second grade, but [the placement] did not have a second grade classroom"), *and Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444–45 (S.D.N.Y. 2014) (finding a substantive denial of a FAPE where the IEP required a 12:1:1 program and a school administrator informed parents that there was no availability in a 12:1:1 class at that placement for the upcoming school year).

Finally, Plaintiffs assert that P4 was an inappropriate placement because it did not use the ABA instruction method required by E.T.'s IEP. (Pl. Mem. at 20, 22.) Here, however, Plaintiffs misread the IEP document. E.T.'s IEP does not mandate ABA instruction; instead, the IEP merely lists ABA as one of several educational techniques that had been successfully used with E.T. during the prior school year. (JA 312 ("[E.T.] learns best in a 1:1 setting or small groups for social activities, in order for him to have the focused staff attention that he needs in order to receive an optimal educational experience. Instructional methodologies *include* ABA, Floor [T]ime, and SI." (emphasis added)).) To conclude that P4 would fail to provide a FAPE merely because it could not guarantee E.T. would receive the ABA instruction mentioned in E.T.'s IEP would be to rewrite the student's IEP and engage in speculation. Accordingly, after reviewing the record presented in this matter, the Court sees no reason to depart from the SRO's finding that DOE's recommendations were "reasonably calculated to enable the child to receive educational benefits" for his 2011–2012 school year. *Rowley*, 458 U.S. at 207.

### C. Reimbursement Inquiry

The parties offer additional arguments regarding whether E.T.'s placement at Ezra HaTzvy met his educational needs and whether the equities support Plaintiffs' claim for reimbursement. However, since the Court finds that DOE provided E.T. with a FAPE, and that his IEP both "complied with the procedural requirements of the IDEA" and was "'reasonably calculated to enable the child to receive educational benefits'" for the 2012–2013 school year, *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07), the Court does not reach those additional steps of an IDEA reimbursement analysis. *See generally D.B. v. N.Y.C. Dep't of Educ.*, No. 10-cv-6183 (RWS), 2011 WL 4916435, at *12 (S.D.N.Y. Oct. 12, 2011) (finding that a reviewing court need not continue to address the final two factors of reimbursement analysis if it finds that the student's IEP was procedurally and substantively adequate).

### IV. CONCLUSION

The Court's review of an IEP under the IDEA is limited: "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal citation and quotation marks omitted). That standard sets a modest goal, one that undoubtedly falls short of what devoted parents would hope to provide for a child working to overcome the substantial challenges of his disabilities. Nevertheless, that limited standard of review requires some deference to the judgment of the school district, and does not permit the Court to simply defer to

the well-intentioned interest of loving parents.

After a thorough review of the record before it, for the reasons stated above, the Court finds that DOE complied with the procedural requirements of the IDEA and that E.T.'s 2011–2012 IEP was reasonably calculated to enable him to receive educational benefits. Accordingly, Plaintiffs' motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 12 and 14, and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: February 19, 2016
        New York, New York

\*   \*   \*

Plaintiffs M.T. and R.T., along with their minor child E.T., are represented by Jesse Cole Cutler and Linda Goldman, of the Law Offices of Regina Skyer & Associates, LLC, 276 Fifth Ave., New York, New York 10001.

Defendant The New York City Department of Education is represented by Son K. Lee of New York City Law Department, 100 Church Street, New York, New York 10007.